THE BANK OF UNION v. R. B. REDWINE, JOHN C. SIKES, ET AL.

(Filed 24 May, 1916.)

**1. Equity—Deeds and Conveyances—Mistake of Draftsman—Issues.**

Where a phase of the controversy depends upon the correction of a paper-writing for mutual mistake of the parties, and the issue submitted was at the request of the appellant, he cannot complain that it related to the mistake of the draftsman and not to that of the parties, it appearing that the mistake of the draftsman necessarily involved that of the parties in the presentation of the case as it was constituted.

**2. Equity—Deeds and Conveyances—Correction—Signing Instruments—Mutual Mistake—Rule of Prudent Man.**

The usual rule that equity will not aid one in correcting an instrument which he should have read before signing is not of universal application, and is subject to exceptions, the test being, in the absence of fraud, whether the party seeking the correction acted with ordinary prudence under the circumstances; and it appearing in this case that the draftsman, a man of repute, in the presence and with the consent of the parties, assumed to make the correction when brought to his attention, equity will not bar the complaining party of his right because he failed to reread the paper-writing thereafter before signing it.

**3. Equity—Deeds and Conveyances—Mutual Mistake—Correction—Original Parties.**

It is held in this case that the equity of correcting an instrument for mutual mistake is not confined to the original parties, approving *Sills v. Ford, post,* 733.

**4. Equity—Deeds and Conveyances—Mutual Mistake—Mistake of Draftsman.**

When it is shown that a deed or other paper-writing was not drawn by the draftsman in accordance with the prior agreement of the parties thereto, equity will correct it.

**5. Same—Evidence—Trials—Questions for Jury.**

Evidence tending to show that the maker of a mortgage included among its security certain certificates of stock he had theretofore on the same day pledged with a bank, that the name of the president of the bank was erroneously inserted in the instrument by the draftsman for the name of his corporation, that the maker was indebted to the corporation, and not to its president, is sufficient to be submitted to the jury upon the question of correcting the instrument accordingly on the ground of mutual mistake of the parties.

**6. Deeds and Conveyances—Equity—Correction—Liens—Conflicting Claimants.**

In construing a mortgage of certain lands and a pledge of certificates of stock, stating in the deed that it was subject to "any existing conveyance of said stock to B., and this only in the event the security,

including personal, he now holds, when exhausted would not pay off and discharge his existing debt against" the maker, it appeared that through mutual mistake the name of B. had been inserted for the name of a bank of which he was president, and that the maker owed the bank and not B., and had prior, but on the same day, pledged the same certificates to the bank to secure his indebtedness there. The instrument being construed was drawn without the knowledge of the bank, but for the parties to that agreement, and the provision as to exhausting other securities, etc., was not contained in the assignment of the certificates to the bank: *Held,* this provision did not apply to the bank, but to the grantee in the deed, the latter of whom held subject to the lien of the former, and was required to first exhaust the other securities he held.

7. **Deeds and Conveyances—Pledges of Security—Conflicting Claimants—Ambiguity—Third Parties.**

Where the owner of securities has assigned them for a debt to different parties, A. and B., on the same day, and in the assignment to B. there are provisions as to first exhausting other securities, but not contained in that to A., to whom the securities had been prior assigned, and who knew nothing of the subsequent transaction: *Held,* the instrument of B., in case of doubt as to the meaning of the provision, will be construed against him in determining the meaning of the parties.

8. **Deeds and Conveyances—Intent—Interpretation—Extrinsic Evidence.**

In construing instruments relating to the same subject-matter the courts may regard the surrounding circumstances, the condition of the parties executing it, and the objects they had in view.

9. **Deeds and Conveyances—Interpretation—Intent—Mala Grammatica.**

The maxim, *Mala grammatica non vitiat chartam,* does not apply in the interpretation of an instrument when it appears that the draftsman was educated and intelligent, and that a grammatical and proper construction will throw light upon its interpretation.

10. **Deeds and Conveyances—Registration—Probate—Deputy Clerks—Office—Women—Constitutional Law.**

Where the owner of certificates of stock has assigned them to different persons as collateral security to the payment of a separate debt to each, the first of which is registered and the latter is not, and it appears from the latter instrument that the prior assignment was the first lien on the shares, the questions of notice by registration and the validity of probate taken by a female deputy clerk of the court, or whether it may be impeached by parol evidence, do not arise. *Semble,* the position of deputy clerk is an office. *S. v. Knight,* 169 N. C., 333, cited and approved, *obiter dictum.*

11. **Actions—Contracts—Usury.**

An action on a contract bearing usurious interest may be maintained in our courts, and the action will not be dismissed because some usurious interest has been charged.

BROWN, J., concurring; CLARK, C. J., dissenting.

BANK *v.* REDWINE.

CIVIL ACTION tried befor*e Carter, J.,* and a jury, at October Term, 1915, of UNION.

This action was instituted by the Bank of Union against the defendant R. B. Redwine and others, for the purpose of establishing its right in and to ten shares of the capital stock of the Lake Land and Lumber Company, belonging to the defendant E. C. Williams and by him assigned to the plaintiff bank as security for certain indebtedness; the immediate purpose of the action being to restrain the defendant John C. Sikes, trustee for R. B. Redwine, from proceeding to sell said shares of stock under a deed of trust alleged by plaintiff to constitute a junior lien upon the same. Issue was joined by defendant Redwine on the priority of plaintiff's lien and on the amount of the debts secured thereby, the said defendant claiming that the plaintiff bank had charged defendant Williams usurious interest on the loan secured by said stock, and asking that plaintiff's debt be reduced on that account. He also invoked the doctrine of marshaling assets, and asked that before proceeding against said stock plaintiff be compelled to exhaust its security on the home place of the defendant Mrs. J. W. Griffin. Mrs. Griffin, who had signed with defendant Williams the note secured by the mortgage of her home place and by the pledge of the said corporate stock, answered that she had signed said note as a surety, and demanded that the plaintiff, before foreclosing the mortgage on her home, exhaust its security on the stock.

An injunction pending the hearing was obtained from Judge Shaw in December, 1914, and the case came on for hearing before Judge Devin at May Term, 1915. At this hearing the issues involving the priority of plaintiff's lien were tried and determined in favor of plaintiff; and it was also found by the jury and adjudged by the court that Mrs. Griffin was merely a surety on the note secured by mortgage of her home and the corporate stock. Judge Devin then referred the case to W. J. Pratt, Esq., to determine the amount of the debts of plaintiff secured by the stock, and to pass upon the question of marshaling. The referee made his report to Judge Carter at October Term, 1915, who passed upon exceptions thereto filed by both sides, and sustained plaintiff's contention that the defendant Redwine, being merely a junior encumbrancer, could not plead usury in the debt of Williams to plaintiff, and held that this was not an appropriate case for the application of the principle of marshaling assets. The court also overruled a motion to dismiss the action because usury had been charged. From these judgments of Judges Devin and Carter adverse to him the defendant Redwine appealed to this Court.

The verdict of the jury before Judge Devin was as follows:

1. Was the paper-writing from E. C. Williams to J. C. Sikes, trustee,

executed by said E. C. Williams subsequent to the execution of the assignment of the Bank of Union? Answer: "Yes."

2. Was the name W. S. Blakeney in said paper-writing from E. C. Williams to J. C. Sikes, trustee, inserted therein in lieu of the words, the Bank of Union, by mistake of draftsman, as alleged in the complaint? Answer: "Yes."

3. Did defendant Redwine take the paper-writing executed by E. C. Williams to J. C. Sikes, trustee, with notice of assignment by said Williams to the Bank of Union of the ten shares of stock in controversy? Answer: "Yes."

4. Was the subscribing witness of the paper-writing executed by E. C. Williams to J. C. Sikes, trustee, in proving same before the deputy clerk of court, sworn upon the Holy Bible? Answer: "No."

5. Was the defendant Mrs. J. W. Griffin surety on the note for $7,500 to the Bank of Union, as alleged in her answer? Answer: "Yes."

The plaintiff, the Bank of Union, claimed the ten shares of stock under a written assignment made to it by said Williams on 12 January, 1902, which assignment was not recorded until 17 November, 1914; and notwithstanding the fact. that the deed of trust made to Sikes, trustee, was dated 4 January, 1912, and the trust was accepted by Sikes, trustee, 6 January, 1912, the plaintiff contended that this deed of trust was executed subsequent to the assignment to the plaintiff. The jury found it was executed subsequently. The plaintiff further contended that it was entitled to the stock in controversy under and by virtue of another assignment. This assignment was dated 1 April, 1914, and recorded on the same date. The plaintiff further contended that the name "W. S. Blakeney" was inserted in the deed of trust to Sikes by mutual mistake of the parties or by inadvertence or mistake of the draftsman in lieu of the name "The Bank of Union." The jury so found. The defendant contends that there was not sufficient evidence of a mistake, and the judge should have so instructed the jury.

The plaintiff further contends that the defendant Redwine had notice of the assignment of the ten shares of stock to the Bank of Union, and, therefore, he took the same subject to said assignment. The jury so found.

The defendant contends that the shares of stock, as evidenced by certificate, is personal estate, and a mortgage of it as made by Williams to the plaintiff should have been recorded, and not having been recorded, no notice, however full and formal, is sufficient.

The plaintiff further contended that notwithstanding the order of probate of the clerk directing the registration of the deed of trust to Sikes for the benefit of the defendant Redwine was in due form, the execution of same was not proven upon oath legally administered, and the registration is a nullity. The jury so found.

The defendant contends that for the purpose of registration or notice, the probate, being in due form, cannot be attacked by evidence *aliunde*. The defendant further contends that the certificate of stock for the ten shares having been placed in the possession of the trustee Sikes, this would be a *pledge—a delivery of the property*—and no registration was necessary.

The deed of trust to Sikes, trustee, after conveying certain personal property, purported to convey the certificate of stock, and then followed the following clause:

"This certificate subject, however, to any conveyances heretofore made of said certificate of stock to J. R. English or the English Drug Company, and also subject to any existing conveyance of said certificate of stock to W. S. Blakeney, and this only in event the security, including personal he now holds, when exhausted will not pay off and discharge his existing debt against Williams."

The plaintiff contended that this provision in the deed of trust does not apply to the security then held by Blakeney, but to that held by Redwine.

The effect of the judgment is to give to this language the construction contended for by the plaintiff, which the defendant contends is erroneous.

Judgment was rendered in favor of the plaintiff, and the defendant appealed.

*Stack & Parker for plaintiff.*
*Armfield & Adams and Cansler & Cansler for defendant.*

ALLEN, J. It is well to consider, first, the exceptions taken by the defendant upon the trial of the issues submitted to the jury, as the verdict has an important bearing on the construction and legal effect of the deed of trust under which the defendant claims the certificate of stock in controversy, and the following are the material questions raised by these exceptions:

1. Are the issues sufficient to sustain the judgment correcting the deed of trust?

2. Was there sufficient evidence of mistake to justify submitting the question to the jury?

3. Was the maker of the deed of trust guilty of such negligence in failing to read the deed that equity will deny him, and the plaintiff claiming under him, the right to correct the deed?

4. Will a court of equity correct a deed upon the ground of mistake except as between the original parties?

The issue as to mistake was tendered by the defendant, and if in any reasonable view it contains the material facts, the defendant ought not to be heard to complain.

The criticism of the issue is that it does not embrace the agreement of the parties; but while the agreement does not appear in the issue in express terms, it is necessarily involved, because there could be no mistake of the draftsman unless there was a previous agreement which he failed to insert in the deed.

Nor do we think there was such negligence on the part of the maker of the deed as will deprive him of the benefit of the equity for correction.

The general rule is as contended by the defendant, that equity helps those who are diligent and not those who are negligent, *Capehart v. Mhoon,* 58 N. C., 178; and ordinarily one who is able to read, who signs an instrument without reading, will not be aided, *Dillenger v. Gillespie,* 118 N. C., 737; but the rule is not of universal application, and is subject to exceptions.

Mr. Pomeroy says in his work on Equity Jurisprudence, vol. 2, sec. 856: "It has sometimes been said in very general terms that a mistake resulting from the complaining party's own negligence will never be relieved. This proposition is not sustained by the authorities. It would be more accurate to say that where the mstake is wholly caused by want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be a violation of legal duty, a court of equity will not interpose its relief; but even with this more guarded mode of statement, each instance of negligence must depend to a great extent upon its own circumstances. It is not every negligence that will stay the hand of the court. The conclusion from the best authorities seems to be that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded. Even a clearly established negligence may not of itself be a sufficient ground for refusing relief, if it appears that the other party had not been prejudiced thereby. In addition to the two foregoing requisites, it has been said that equity would never give any relief from a mistake if the party could by reasonable diligence have ascertained the real facts; nor where the means of information are open to both parties and no confidence is reposed; nor unless the other party was under some obligation to disclose the facts known to himself, and concealed them. A moment's reflection will clearly show that these rules cannot possibly apply to all instances of mistake, and furnish the prerequisite for all species of relief. Their operation is, indeed, quite narrow."

A large number of authorities are collected in the notes to *Vallentyne Land Co. v. Immigration Co.,* 5 A. and E. Anno. Cases, 215, and *Grieve v. Grieve,* 11 A. and E. Anno. Cases, 1164, supporting the position that, in the absence of fraud, the true test is whether the party

seeking correction acted as one of ordinary prudence under the circumstances.

We have also said: "The law does not require a prudent man to deal with every one as a rascal. There must be a reasonable reliance upon the integrity of men, or the transaction of business, trade, and commerce could not be conducted with that facility and confidence which are essential to successful enterprise and the advancement of individual and National wealth and prosperity. The rules of law are founded on natural reason and justice, and are shaped by the wisdom of human experience, and upon subjects like the one which we are considering they are well defined and settled." *Walsh v. Hall,* 66 N. C., 238, approved in *Leonard v. Power Co.,* 155 N. C., 14.

Applying these principles to the evidence, we cannot say that the maker of the deed is barred of his equity because of his negligence in failing to read the deed.

He testified, in substance, that he had agreed to execute a deed of trust for the benefit of Redwine; that Redwine prepared the deed; that the deed was read in the office of Redwine, and when he, the maker, discovered the certificate of stock was in the deed, he refused to sign, stating that he had already assigned the stock to the Bank of Union; that Redwine then said it would not hurt to make it subject to the paper of the Bank of Union; that it was agreed that the deed should be changed so that it would be made subject to the paper of the bank; that Redwine said he would make it subject to the paper of the bank, and turned to his desk and interlined the deed, and that he then signed the deed, relying upon the promise of Redwine to make it subject to the paper of the bank.

One of ordinary prudence, knowing the high character and intelligence of Mr. Redwine, might under these circumstances reasonably sign the deed without reading it.

Nor do we think that the equity of correction is confined to the original parties to the deed. It has been held otherwise at this term in *Sills v. Ford,* in which the authorities are collected and discussed in an elaborate opinion by *Associate Justice Walker,* and that case substantially covers all the exceptions arising on the trial of the issues.

The remaining question is whether there was evidence of mistake, and this must be answered against the defendant.

The equity to correct an instrument when by the mistake of the draftsman it is not drawn according to the prior agreement of the parties has been recognized from the earliest times, and we will only refer to a few of the later authorities.

The Court says, in *King v. Hobbs,* 139 N. C., 172: "The plaintiff and the defendant then went to a justice of the peace to have their contract put in writing, and the justice, evidently by inadvertence or mistake

(whether of himself or the parties makes no difference), omitted a material stipulation. In such case all the authorities are agreed that the instrument will be reformed so as to express the true intent and meaning of the parties.

"This is not an instance of an essential mistake or misunderstanding in the agreement itself, nor where the written instrument is supposed to embody the first and only contract of the parties, but is a case of an error of expression where the parties have come to a definite agreement beforehand, and, in the endeavor to put this agreement in writing, a mistake is made, so that the instrument as drawn does not, in some material point, express the contract it was intended to evidence. In 20 A. and E. Enc. (2 Ed.), p. 823, it is said: 'That in mistakes of this kind the only inquiry is, Does the instrument contain what the parties intended that it should, and understood that it did? Is it their agreement? And it is wholly immaterial whether the defect is a statutory or common-law requisite, or whether the parties failed to make the instrument in the form they intended, or misapprehended its legal effect.' The authorities are numerous and fully bear out this statement of the doctrine. . . . 'Nor will the fact that the defendant denies that there is a mistake, and testifies that the deed was drawn according to the intention of the parties, prevent the court from granting the relief if it is satisfied that the deed is not in accordance with the agreement, but ought to be so.'" In *Arthur v. McClure,* 166 N. C., 144: "It is said in 34 Cyc., 908, to be settled by a host of authorities that where because of mistake an instrument does not express the real intention of the parties, equity will correct the mistake, unless the rights of third parties, having prior and better equities, have intervened. This is done, not for the purpose of relieving against a hard or even oppressive bargain or to give either party a better one, but simply to enforce the agreement as it was made and to prevent the injustice which would ensue if this is not done. . . . Whenever an instrument is drawn with the intention of carrying into execution an agreement previously made, and by mistake of the draftsman or scrivener it fails to do so, the mistake will be corrected and the original contract enforced according to the real intention of the parties"; and in *Shook v. Love,* 170 N. C., 99, a mistake will be corrected "when it is the mistake of the draftsman who is intrusted to prepare the instrument."

The deed bears evidence of mistake on its face, because in the absence of mistake there could be no reason for inserting the name of Blakeney in the deed, when he held no securities of the maker of the deed, Williams, and to whom he was not indebted.

There is also the direct evidence of the maker of the deed, before recited, that the defendant Redwine agreed to interline the deed and make it subject to the claim of the Bank of Union, and that instead of doing so he wrote it subject to the claim of Blakeney.

This can be explained only on the ground of fraud or mistake, and the plaintiffs do not charge fraud.

When the high character of the parties is considered, the reasonable conclusion is that the mistake occurred because Mr. Blakeney was president of the Bank of Union and had charge of its affairs, and one or the other of the parties spoke of him, when referring to the bank.

We, therefore, conclude that no error has been committed in the trial before the jury.

If the findings upon the first and second issues are supported by evidence, and are not disturbed, it becomes necessary to determine the meaning of the language in the deed to Sikes, trustee, as follows: "This certificate subject, however, to any conveyances heretofore made of said certificate of stock to J. R. English or the English Drug Company, and also subject to any existing conveyance of said certificate of stock to W. S. Blakeney, and this only in event the security, including personal he now holds, when exhausted will not pay off and discharge his existing debt against Williams."

It is the latter part of this stipulation, "and this only in event the security, including personal he now holds, when exhausted will not pay off and discharge his existing debt against Williams," that is in dispute.

There are three possible constructions of this clause. The first is that Blakeney is required to exhaust other securities before resorting to the stock to discharge his existing debt. This must be rejected, because Williams was not indebted to Blakeney, and Blakeney held no securities, personal or otherwise, and the jury has found that his name was inserted in the deed by mistake.

We must, then, adopt one of the other two constructions, the plaintiff contending the duty of exhausting other securities is imposed on the defendant, and the defendant that it is imposed on the plaintiff bank.

The deed of trust was drawn by the defendant Redwine, and the bank was not a party to it, and was not represented when it was prepared.

We may, then, well apply the rule apparently well settled, "that words will be construed most strongly against the party who uses them" (9 Cyc., 590), or, as stated in 6 R. C. L., 854, "A written contract should, in case of doubt, be interpreted against the party who has drawn the contract."

This rule is not conclusive or controlling, but is accepted as an aid in determining the meaning of the parties.

It is also "a fundamental rule of construction that the courts may look not only to the language employed, but to the subject-matter and surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made." *Merriam v. U. S.,* 107 U. S., 441; *R. R. v. R. R.,* 147 N. C., 382.

"To ascertain the intention regard must be had to the nature of the instrument itself, the condition of the parties executing it, and the objects they had in view." *Bank v. Furniture Co.,* 169 N. C., 180.

Let us, then, look at the surrounding circumstances, the condition of the parties, the subject-matter, and the object the parties had in view.

When the finding upon the first issue is read in connection with the evidence, we find that on the same day the deed was executed to Sikes, trustee, *but prior thereto,* the debtor, Williams executed a written transfer or assignment of the stock to the plaintiff bank as a security for debt, and that there is no requirement in that instrument that the bank must exhaust other securities before resorting to the stock.

Is it not reasonable to conclude, as the two papers were executed to different parties on the same day, dealing with the same subject-matter, if the restriction appearing in the deed to Sikes, trustee, was intended to refer to the bank, it would have been inserted in the assignment to which it was a party; and if it refers to the defendant Redwine, do we not find it where it would naturally appear?

The debtor Williams had already assigned the stock to the bank, and it is not to be believed that, in a subsequent deed, which he intended to make subject to this assignment, he attempted to impair its effect without the consent of the bank.

Again, the clause in the deed of trust must be read in connection with the verdict, which finds that the words "W. S. Blakeney" were inserted by mistake in lieu of the words "the Bank of Union," and, in legal effect, that it was the intention of the parties for the clause to read as follows: "The certificate subject, however, to any conveyances heretofore made of said certificate of stock to J. R. English or the English Drug Company, and also subject to any existing conveyance to the Bank of Union, and this only in the event the security, including personal *he* now holds, when exhausted will not pay off and discharge *his* existing debt against Williams."

The maxim, *"Mala grammatica non vitiat chartam,"* is applied when it appears that the instrument has been prepared by one unskilled in the use of language, and when the grammatical construction is at variance with the intent of the parties as indicated by the whole instrument; but if it appears that it is the work of the educated, intelligent draftsman, grammatical construction and arrangement will be considered, and here the pronouns "he" and "his" used instead of "it" and "its" naturally refer to the defendant, and not to the bank.

Neither party has seemed to attach any significance to the use of the word "personal," presumably because both the bank and the defendant Redwine had personal security, and it appears from the evidence of the latter that he had indorsements on some of his debts.

We are, therefore, of opinion that the true interpretation of the clause

in the deed now before us is that the certificate of stock was assigned as a security for the debt due the defendant Redwine, subject to the prior assignment to the plaintiff, with the restriction that he (Redwine) could not resort to the stock until he had exhausted his other securities; and thus understood, when considered in connection with the verdict finding that the words "W. S. Blakeney" were inserted in lieu of "the Bank of Union," and that the deed was executed after the assignment to the plaintiff, it is not necessary to consider the other interesting questions, argued with much learning and ability, as to whether the defendant's interest in the stock is that of pledgee or mortgagee, whether the probate of the defendant's deed is defective on account of the witness by whom the execution was proved being sworn with uplifted hand, before a woman, who purported to take the probate as deputy clerk, or whether parol evidence is admissible to attack the probate; because if a pledge of a mortgage duly probated and registered, and if the probate cannot be attacked, it is on its face and by its terms, under the construction we have placed on it, subject to the assignment to the plaintiff. *Hinton v. Leigh,* 102 N. C., 28; *Bank v. Vass,* 130 N. C., 593.

In the last case the words in the mortgage following the description of the land, "said 239¾ acres subject to a mortgage or deed of trust for about $1,900, balance of purchase money on the same," were held sufficient to establish a trust in favor of the holder of the first mortgage, although registered after the second mortgage.

In declining to pass on the other question raised we must not be understood as entertaining any doubt as to the right of a woman to hold the office of deputy clerk of the Superior Court, and we mention it lest citizens might be misled by our silence to jeopardize their titles. That the position is, by statute, an important public office is clear from the duties to be performed; that deputies are required to take and subscribe the oaths required of clerks (Rev., sec. 898); that the clerk is required to make a record of the appointment of the deputy in his own office and to require it to be registered in the office of the register of deeds (Rev., sec. 899); that the clerk is required to make a record of the removal of the deputy from *"his office"* (Rev., sec. 899); that the deputies are subject in all respects to the laws applicable to clerks (Rev., sec. 900); and that they may administer oaths only if they are "sworn officers" (Rev., sec. 2350); and if it is a public office, a woman cannot hold it until the Constitution is changed. *S. v. Knight,* 169 N. C., 333.

It is unnecessary to repeat the reasons given for the decision of the Court in the *Knight case,* but none of them were based on the inferiority of women or their unfitness for office. The propriety and wisdom of female suffrage, and of the eligibility of women to hold office are political questions, which must be settled by the people, and which we cannot discuss or consider in the determination of legal questions.

We simply declare the law as we find it, without usurping the power to change the Constitution, a power which the people have reserved to themselves.

The question is also raised as to the right of the defendant Redwine to plead usury in the debt between the defendant Williams and the plaintiff; but as we understood it to be admitted on the argument, and the admission seems to be borne out by the record, that this plea, if sustained, would not afford any relief to the defendant if the claim of the plaintiff to priority was upheld, which we have done, we do not consider it.

The motion to dismiss the action because it appears that some usurious interest has been charged cannot be allowed.

The statute prescribes the penalties for usury and does not declare that no action may be maintained upon contracts tainted with illegal interest, and numerous precedents for such actions in law and equity may be found.

The facts found by the referee and the judge, when reviewing the report, seem to be fully supported by the evidence.

No error.

BROWN, J. I concur in the well considered opinion of the Court by *Justice Allen* in this case. As it is admitted that the right of a woman to perform the duties and fill the position of a deputy clerk of the Superior Court or of deputy register of deeds is not involved in the decision of this appeal, I prefer to withhold my judgment upon that interesting question until it is necessarily presented for adjudication.

CLARK, C. J., dissenting: The plaintiff bank, holder of a junior registered mortgage, seeks to restrain John C. Sikes, trustee for R. B. Redwine, from proceeding to sell ten shares of stock of the lumber company conveyed in a prior registered deed of trust to him by the same grantor, E. C. Williams. It is admitted that said deed to Redwine was registered first upon a probate thereof which was taken and certified by the deputy clerk of the Superior Court, Mrs. Katherine Huntley, who at the time of taking the probate was Miss A. K. McDowell.

The point is made in the plaintiff's brief that the registration of the Redwine deed is void "because the deputy clerk was a woman, and, therefore, not qualified to administer an oath." The opinion of the Court holds with that contention, and if such holding is correct, the other points discussed in the opinion are unnecessary and merely *obiter dicta.* The point is one of far-reaching importance to the public, lies at the root of this matter, and it is not necessary to do more in this dissent than to give the reasons why the writer does not concur in that conclusion.

This Court has repeatedly held that registration upon an invalid probate is void. *Todd v. Outlaw,* 79 N. C., 235; *Long v. Crews,* 113 N. C., 256; *Lance v. Tainter,* 137 N. C., 249; and there are other cases to the same purport. In *Long v. Crews,* 113 N. C., 258, the Court held that "the attempted acknowledgment of the deed in trust before an officer disqualified to act is a nullity," and could not be cured by registration.

The question, therefore, is simply whether a woman is disqualified to act as deputy clerk of the Superior Court. The probate, like any other judgment, is no judgment if the official had no authority to make it.

The decision, aside from its effect on the parties to this action, is one of great importance to the public. Not only the deputy clerk taking this probate in Union County was a woman, but three other ladies have filled the same position in that county in recent years, and if this probate is invalid because taken before a woman, it may seriously affect a large number of titles in that county as well as the validity of legal proceedings which have been verified before them. Besides, in Sampson also and other counties in this State it is well known that women have discharged the duties of deputy clerk. In Henderson County and some others women have very acceptably discharged the duties of deputy register of deeds. It did not occur to the clerks and registers in those counties that there was any innate, inherent inferiority in women which made it improper for them to discharge those duties, which they doubtless did faithfully and acceptably, and the intelligent lawyers in those counties were evidently not able to point out any provision in the State Constitution, or in the statutes, which disqualified women from holding those positions.

Deputy clerks are appointed by the clerks and are paid by the clerks themselves, except in the counties where the officers are on a "salary basis." Revisal, 989, provides that probates and acknowledgments of all instruments may be made "before the deputy clerks of the Superior Courts." Neither that statute nor any other requires that such deputies shall be males. The assertion that in North Carolina women cannot hold such position, or, indeed, any other, is challenged by this case. The rights of the parties depend upon this question.

Approaching the subject freed from preconceived opinions, we shall find nothing that disqualifies women from holding this position either in our Constitution or in our statutes or in our system of government, nor in England, from which we derive our laws.

The only provision in the Constitution which refers to a "voter" in any connection with "office" is in the Constitution of 1868, and that, as we said in *S. v. Bateman,* 162 N. C., 581, is not a provision disqualifying from office every one who is not a voter. But the provision is "just the opposite," and prohibits a voter from being disqualified for

office. We pointed out the reason for this, which did not exist under the previous Constitution of this State, in that in 1868 a large number of colored voters were enfranchised and the convention that framed the Constitution, fearing that in the future there might be an effort to disqualify them to hold office, provided that every voter should be eligible to office, with the disqualifications mentioned further on in the Constitution. It would be singular if negro men are competent, while white women are their political inferiors.

The constitutional provision, therefore, it will be seen, does not disqualify women from holding any office, even constitutional ones. It merely prohibits the disqualification of voters from holding office unless disqualified by the Constitution itself. Art. VI, sec. 8, and Art. XIV, sec. 7.

The convention that formed the Constitution seems to have had the most implicit faith that the people were competent to select their own officers, and, therefore; Art. VI imposes no disqualification upon any one to hold office except those named in the above sections. "The Amendment of 1900, while imposing some restriction upon suffrage, left intact the provision that all who continued to be 'voters' remained eligible to office." *S. v. Bateman, supra.*

This decision, rendered as recently as the spring of 1913, calls attention clearly to the fact that our Constitution does not prohibit any one from holding office because not a voter, but, on the contrary, merely prohibits the Legislature from disqualifying any voter from holding office.

The preconceived opinion that women are disqualified to hold any office is based upon the error that the qualification for suffrage and the qualification for office are the same. This is not true, and never has been so under any of the Constitutions of this State. Our present Constitution clearly prescribes a qualification for suffrage, but except as to the age, which is required as to certain State officers therein named, there is no qualification required for office, but that is left to the sound judgment of the voters. It is not even required that judges shall be lawyers. The Legislature is merely prohibited, as is seen, to disqualify any voter from holding office.

Under the Constitution of this State adopted at Halifax in 1776, many were disqualified from voting who were eligible to office, and many were disqualified from office who were eligible to vote. For instance, up to the Convention of 1835 no one was eligible as a voter to choose the Governor, the judges, or the State officers, unless he was a member of the Legislature; and up to 1856 no one could be a voter in the election of a State Senator unless he owned 50 acres of land. On the other hand, citizens were eligible to the State offices, to the judgeships, and for United States Senator, even though they were not

qualified electors for those positions because not members of the Legislature. Qualifications for office were required which were not required for the electors for such office: for instance, a member of the Senate was required to own not less than 300 acres of land in fee, while an elector for that position was required to own only 50 acres. A member of the House was required to own not less than 100 acres of land, while an elector for that position was required only to be 21 years of age and to have paid his taxes. The Governor was required, as he is still, to be 30 years of age, but the requirement then and now as to the voters is 21 years.

On the other hand, though those otherwise qualified were disqualified to vote unless 21 years of age, there was no disqualification by reason of age as to holding office (except as to the Governor), and there were instances of men serving in the Legislature under 21, though they could not vote themselves for such members. The changes in 1835 and since have consisted in removing property qualifications for voting and for holding office and by adding the new requirements that a Senator must be 25 years of age, that a member of the House must be "a qualified voter"—the only instance of this—but (except for the Governor and Lieutenant Governor) there is no age requirement as to any other officers, and, singularly enough, there is no requirement that these last two or any other officers than member of the House, shall be a voter. The provision as to the Governor is that he must be a "citizen of the United States and a resident of this State." As far as possible, our present Constitution has left the qualifications for office to the voters or the appointing power, as the case may be, the restriction being, as already stated, that the Legislature shall not disbar any one who is a voter from being eligible to any office (with the above qualifications as to the age of certain officials) except as provided in section 8 of Art. VI, and sec. 7, Art. XIV of the Constitution.

We look in vain in the Constitution, as it is written by the Convention and ratified by the people, to find any disqualification placed on women to hold any office in the State. In that respect we pursued the same policy as the Constitution of the United States, under which women are eligible for any position from President to United States Commissioner. Under the Federal Government women have held thousands of positions, a large number of them being postmasters, and they have filled many other positions, among them, Collector of Internal Revenue. In the *same absence of restriction* in our State Constitution as in the Federal Constitution, there is no reason why the women of North Carolina who are competent to hold any position in the Federal Government should be disqualified from holding any position under the State to which they can secure an appointment or an election.

Certainly there can be no reason why a woman cannot be a deputy clerk, when she can be a postmaster, since there is neither statute nor constitutional provision giving them greater recognition under the Federal Government than under the State.

Surely, as to the position of deputy clerk, a woman should not be held ineligible, since we have held that a minor, who cannot be a voter, is eligible to be a deputy sheriff. *R. R. v. Fisher,* 109 N. C., 1; *Yeargin v. Siler,* 83 N. C., 348. In the latter case it is held that a minor can be a general deputy sheriff as well as a special deputy sheriff, and that "this is the current of authority in this country."

If we could import into our Constitution words and phrases which are not there, because of the supposed custom that women were disqualified in England, we will find that this suggestion is equally unfounded. From the time of William the Norman, the founder of the dynasty which still reigns in England, there have been forty executive heads of the Government, and of these seven have been women. Among these, the two ablest executives, certainly the two most illustrious and successful, the first of whom reigned for forty-five years and the latter for sixty-four, were Elizabeth and Victoria. In that country women have held many other high positions, and among them, as all lawyers know, the highest legal position in England, that of Lord Chancellor, was held by a woman, Eleanor of Provence, nearly a century before any man was trusted in that high office other than an ecclesiastic. Women have held many other positions in England of every kind (among them that of sheriff, who there is a judicial officer and sits on the bench with the judges), though they were not voters until thirty years ago, when they were granted municipal suffrage. This shows that there, as well as here, qualifications for suffrage and qualifications for office are not the same, the choice as to officers not being restricted by any artificial barriers as to sex, but left to the sound judgment of the electors or the appointing power.

We know that in other countries the greatest executives have been, in Russia, Catherine the Great; in Austria, Maria Theresa; in Spain, Isabella, and among the sovereigns now on the throne, in the present great world catastrophe, none has steered the ship of state more safely than Queen Wilhelmina of Holland. Evidently there is no inherent inferiority which has disqualified women for even the highest offices.

The Salic law which barred women from being the sovereign, the highest office, did not exist in any country in Europe (outside of Turkey) except in France. That law was based on the idea that the chief executive should be a fighter. The modern republican conception is that the qualification for office is not physical strength, but mental capacity and character. There is, therefore, no ground to write the Salic law into our Constitution.

Nor is there anything in Scripture, as it has been asserted, against it, for we know that Deborah was ruler over all Israel, with supreme power, both executive and judicial.

But it is urged that the duties of the deputy clerk, though not a very high position, are "judicial." It is perhaps natural that judges should think that "duties judicial" require a peculiar qualification of mind. They would not like to say, perhaps, "a mind superior to that possessed by women," but "a mind of a different cast from that of women," for though they have been able sovereigns, they might not make good judges, and might be "too emotional" to properly probate this deed in trust! But Sacred History says that Deborah, when she was "Judge over all Israel, judged wisely," and that during her judicial adminis- tration of forty-five years "Israel had peace"—after the brilliant vic- tory which proved her genius for war as well as in peace. We know, too, that Portia won great fame as a judge in a great case, and in Eng- lish law, as already stated, from the Norman conquest in 1066 down to 1341, when Sir Robert Bourchier was the first layman appointed, the only Lord Chancellor who was not an ecclesiastic was Eleanor of Pro- vence, who was appointed Lord Chancellor in 1253, and Lord Campbell in his "Lives of the Lord Chancellors" says that she sat in the Aula Regis in person and administered the duties of her high position with vigor.

There is nothing in our statute that prohibits a woman from being a deputy clerk. The provision in the statute, cited by the Court, that the clerk shall make the record of the removal of the deputy "from *his* office," is no implied disqualification of women, for Revisal, 2831 (1), provides that in all statutes "Every word importing the masculine gen- der only shall extend to and be applied to females as well as to males, unless the context clearly shows to the contrary." This is the well settled previous judicial holding, that when any statute uses the word "his" it means "his or her" unless something in the context prohibits.

Nor will it be any answer that some former judges have expressed an opinion that women are disqualified for office by our Constitution. In those cases the point was not made, certainly not as to this office. But if it had been, those judges were as likely to err as are the judges of today. When the question is as to the provisions of a Constitution, the inquiry is not what the judges on some other occasion have said that the Constitution provides, but what does it in fact provide. The dis- qualification of women for office is not there. We can read as well as they, and the test is not what they said, but what is the text of the Con- stitution.

"We must not make the *word* of none effect by our traditions."

Women pay taxes and own approximately one-half of the property of the State, for they inherit equally with their brothers when there is no

will, and are rarely discriminated against when there is. They do more than one-half the work of keeping up our civilization. As a class, they are the equals of men in intelligence and their superiors in morality. Why should they be barred from all public employment of every kind, or of any kind? The Court should not place the bar sinister of disqualification upon the whole sex, and disqualify them from holding office, unless there is an express provision of the Constitution.

The last census showed that out of 950,000 persons in this State employed outside of their homes, in gainful occupations, 275,000, or nearly 30 per cent, were females. They are engaged in making an honest living; and while women are rarely aspirants for office, even in the many States and countries where they now enjoy full suffrage, it is but right, in consideration of their contribution of labor and taxes to the public weal, that they should not be debarred from obtaining the compensation attached to an office like this, whose small compensation is paid by the clerk himself, when the appointing power (the clerk) has deemed them competent, and, indeed, has selected four women in succession for the duties which they had discharged evidently to his satisfaction.

Even if any judge has heretofore expressed an opinion (without the thorough light which has now been thrown upon the subject by the general public discussion of the matter) that "women are ineligible to office," such previous opinion is no estoppel. When in the House of Lords an ex-Lord Chancellor observed to Lord Brougham that twenty years previous he had agreed with him in the legal views then expressed, Brougham replied: "In twenty years I have become wiser. The noble Lord has had the same opportunity." In a debate in Congress, on a memorable occasion, an opponent made a similar remark to Robert Toombs of Georgia. He replied: "That is one of my discarded errors. The gentleman may defend it, if he can."

Upon looking at the subject in the cold, clear light of the words of the Constitution and of our statutes, it will be found that women are not disqualified to hold office either by the Constitution of this State or of the Union, nor by any statute, nor by the precedents in England, nor by the experience of other countries, nor by anything that can be cited from the Scriptures.

Office, from the Latin *"officium,"* means duty or service. Officers are public servants. Why should the Constitution prohibit the people from getting the best service and the public servants they may desire? There is nothing in human experience, or in history, to sustain the idea of the inherent incapacity and inferiority of women. What have the mothers, wives, sisters, and daughters of the voters of North Carolina done that the Constitutional Convention should have branded them with the opprobrium of being incompetent to render public service? In the

language of Scripture, "Have they not done us good, and not evil, all the days of our lives?" They pay taxes and are subject to the laws. Why should they be held barred from the honors or the emoluments of any employment which the voters or the appointing power may select them to discharge? Why should the defendant Redwine lose the priority given him by the registration of his mortgage because the public official furnished him by public authority to take the probate (which was done in due form) was a woman?

If the prior lien of the defendant Redwine is destroyed for this reason, and he is postponed to the payment of the junior registered lien of the plaintiff bank, he should at least have the right to reduce the debt of the bank, which is thus preferred to his by no fault of his, by striking out the usury therein charged. As the bank has appealed to the courts to get this advantage over the defendant Redwine, who held the first registered mortgage, the bank debt should not go ahead of his debt except to the extent that the bank debt is lawful, that is, after purging it of the usury.

The bank ought not to recover its debt with usurious interest, nor should Redwine's prior registered mortgage, acknowledged before a duly appointed and recognized deputy clerk, be invalidated because she happened to be a woman. She exercised only the power of all deputy clerks, as conferred by Revisal, 989.